**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| SHELBY STEWART | § |
| KENNETH PERKINS | § |
| ADRIAN WRIGHT, | § |
| RAUL COLLINS, | § |
| WISLEY EPPS, | § |
| and CHARLES MICKENS, | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | §   CIVIL ACTION NO. H-07-4021 |
| | § |
| CITY OF HOUSTON, and | § |
| CITY OF HOUSTON CHIEF OF | § |
| POLICE HAROLD HURTT, | § |
| | § |
| Defendants. | § |

## MEMORANDUM AND RECOMMENDATION ON
## MOTION FOR SUMMARY JUDGMENT

This matter was referred by United States District Judge Lee H. Rosenthal, for full pretrial management, under 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #6). Plaintiffs Shelby Stewart, Kenneth Perkins, Adrian White, Raul Collins, Wisley Epps, and Charles Mickens ["Plaintiffs"], allege that they were discriminated against, on the basis of their race and disability, by the City of Houston Police Department, and Chief of Police Harold Hurtt ["Defendants"]. (Plaintiffs' Second Amended Complaint ["Complaint"], Docket Entry #17). Plaintiffs further claim that they were subjected to unlawful retaliation after they complained of this discrimination. (*Id.*). Defendants have moved for summary judgment on each of Plaintiffs' claims under 42 U.S.C. § 1981, and 29 U.S.C. § 794, the Rehabilitation Act of 1973. (Defendants' Motion for Summary Judgment ["Defendants' Motion"], Docket Entry #38). Responses and replies have followed. (Plaintiffs' Response to Defendants' Motion for Summary

Judgment ["Plaintiffs' Response"], Docket Entry #45; Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment ["Defendants' Reply"], Docket Entry #46). After a review of the motion, the evidence provided, and the applicable law, it is **RECOMMENDED** that Defendants' motion be **GRANTED**.

**BACKGROUND**

Plaintiffs, all African-American officers for the City of Houston Police Department ("HPD"), allege that they suffer from *pseudofolliculitis barbae* ("PFB"), a condition that causes severe skin inflammation after shaving, and that disproportionately afflicts African-American men. (Plaintiffs' Response; Ex O to Defendants' Motion: Deposition of Milton Moore 155:5-6). In this litigation, Plaintiffs challenge HPD's grooming policy, which prohibits uniformed officers in four divisions from wearing beards. They allege that the policy is racially discriminatory, and that it fails to accommodate Plaintiffs' medical condition. (Complaint). Plaintiffs complain that, because of this policy, they are "unable to work extra jobs which are customary for all law enforcement officers," and that they "are ineligible for any work assignments or promotional opportunities that require the wearing of police uniforms." (*Id*. ¶ 13).

The record before the court is clear that the police department has "long had a grooming policy, which was initially promulgated to ensure that HPD's uniformed police officers presented a uniform appearance to the public." (Ex. A to Defendants' Motion: Affidavit of Harold Hurtt ["Hurtt Affidavit"] ¶3). From 1993 to 2005, the grooming policy outlawed beards, but it did provide a temporary medical exemption for those officers with a "skin condition which prohibits shaving, such as [PFB]." (Hurtt Affidavit, *12/22/1993 Personal Appearance and Grooming Standards, General Order 300—15*). There is no dispute, however, that Defendants were forced to reconsider that policy in light of changed circumstances following the terrorist

attacks on New York City and Washington, D.C. on September 11, 2001. (Hurtt Affidavit ¶6). In fact, after those attacks, the Department of Homeland Security offered grants to urban police departments to provide employees with personal protective equipment in the event of a chemical, biological, radiological, or nuclear ("CBRN") attack. (*Id*.). It is further undisputed that "HPD's uniformed officers will be first responders to any potential CBRN attack." (Hurtt Affidavit ¶5). As first responders, "uniformed officers may have to – while remaining outside of any contaminated zones – establish security perimeters, assist with evacuation and decontamination of wounded persons, control traffic, and allow clear entry into any contaminated zone for Hazmat personnel." (*Id*.). Because CBRN attacks may involve "disabling or fatal assaults on the respiratory system," those officers serving as first responders are required to carry a respirator or gas mask, and they are directed to "put on the appropriate personal protective gear and back out of the area." (*Id*.; Ex. B to Defendants' Motion: Deposition of Harold Hurtt ["Hurtt Deposition"] 18:14-19:4). To that end, Defendants researched available respirators that are "easy to use; versatile; cost effective; and compatible with the use of other police equipment," and which would not "impair mobility or prevent the public from identifying a uniformed police officer as such." (Hurtt Affidavit ¶8). Several types of respirators, including powered air purifying gas masks, mouth bit gas masks, and hooded escape respirators, were rejected for the following reasons:

> [P]owered air purifying gas masks are heavy, consist of multiple parts, and are difficult to don, making them inappropriate for use by first responders. Mouth bit gas masks seal around the mouth and nose, but they do not offer protection to the eyes and they restrict verbal communication making them unsuitable for use by first responders. The escape hood gas mask is bulkier and more difficult to don. It can interfere with the use of other equipment. Finally, escape hoods provide a more limited duration of protection . . . which makes the escape hood inappropriate for use by first responders.

(Ex. D to Defendants' Motion: Affidavit of Robert Brennan ["Brennan Affidavit"] ¶4). Ultimately, the City selected the Scott Promask 40, which Defendants' expert witness, Robert Brennan, considers to be "one of the most suitable respirators available . . . for first responders." (Brennan Affidavit ¶5). In fact,  he testified that it is "in common use by civil defense and law enforcement authorities around the world." (*Id*.). Brennan points out, however, that the Scott Promask 40 "cannot safely be used by persons with facial hair that can come between the respirator's sealing surface and the skin." (*Id*.). Indeed, the manufacturer warns that "the respirator MUST NOT be worn when conditions such as growth of a beard . . . prevent a good facial seal." (Ex. D to Defendants' Motion: Report of Robert Brennan ["Brennan Report"]). Further, three national regulatory bodies also recognize that beards may inhibit the proper function of a respirator. The Occupational Safety and Health Administration ("OSHA") recommends that "the employer shall not permit respirators with tight-fitting facepieces to be worn by employees who have . . . facial hair that comes between the sealing surface of the facepiece and the face." (*Id*.). Similarly, the National Institute for Occupational Safety and Health ("NIOSH") advises that "[f]acial hair that lies along the sealing area of the respirator, such as beards. . . should not be permitted on employees who are required to wear respirators that rely on a tight facepiece fit to achieve maximum protection." (*Id*.). Finally, the American National Standards Institute ("ANSI") suggests that, a "person shall not be fit tested if facial hair comes between the sealing surface of the facepiece and the face." (*Id*.).

Following selection of the Scott Promask 40, HPD's uniformed officers were issued the masks, trained in their use, and individually tested to ensure that the seal on the mask was proper. (Ex. L to Defendants' Motion: Deposition of Vicki King ["King Deposition"] 183:13-25). In 2005, once it was decided that bearded officers could not effectively use the Scott Promask 40,

HPD revised its grooming policy to prohibit beards on any uniformed officer, regardless of his medical condition. (Hurtt Affidavit, *3/2/2005 Revision of General Order 300-15 HPD Circular*). Under that revised policy, if a uniformed officer is unable to shave, for medical reasons, he is transferred "to a plainclothes assignment in another division." (Hurtt Deposition, *3/28/05 Appearance and Grooming Standards (REVISED: Original Circular 05-0302-067)*). Such reassigned officers can continue to "work police related extra employment… ONLY if their duties [could] be performed in plainclothes." (*Id*.).

At the time that the grooming policy was first revised, each of these Plaintiffs was a uniformed officer, and each was reassigned to a plainclothes position, based on the representation that he suffered from PFB, and was unable to shave. Following their reassignments, Plaintiffs filed complaints with the Equal Employment Opportunity Commission, alleging that "only blacks" with PFB were being "taken out of their uniform because of their facial hair." (Ex. H to Defendants' Motion: Deposition of Adrian White ["White Deposition"] 89:11-12; Ex. I to Defendants' Motion: Deposition of Raul Collins ["Collins Deposition"] 73:14; Ex. J to Defendants' Motion: Deposition of Wesley Epps ["Epps Deposition"] 33:1-3). Presumably, Plaintiffs received a right to sue letter from the EEOC, and, in November 2007, they filed their Original Complaint, alleging race discrimination in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e(2)(a), Title VII to the Civil Rights Act of 1964.

Notably, after this action was filed, and on the recommendation of the Houston Police Officer's Union, Chief Hurtt created a committee to "study and address the concerns raised by uniformed officers who suffered from [PFB]," and to identify possible "accommodations." (Hurtt Deposition 70:11-12; Hurtt Affidavit ¶13, *9/30/2008 Beard Committee Final Report*). The Committee recommended, and Chief Hurtt ultimately adopted, a second revision to the HPD

grooming policy, the policy at issue here. The current policy allows bearded officers to remain in uniform, so long as "it is determined by the officer's attending physician and the City Medical Director that the condition interfering with the respirator seal is permanent." (Hurtt Affidavit, *10/15/08 Use of Respirators HPD* Circular). Under the current policy, officers affected by PFB are issued "escape hood respirators" instead of the Scott Promask 40. Those officers utilizing an escape hood respirator, however, are precluded from assignments in the following four uniformed divisions: SWAT, Special Response Group, Crime Scene Unit, and the "Calls for Service Loop in Patrol" unit. (King Deposition, *7/9/2008 Preliminary Beard Committee Report*). The evidence is uncontroverted that officers in these divisions are the most likely to serve as first responders, and that "by their very nature, [the four divisions] regularly require officers to train for and to engage in situations where gases and hazardous materials are used." (*Id.*). The current policy became effective on October 15, 2008. (Hurtt Affidavit ¶ 14).

Plaintiffs have not revised their Second Amended Complaint, filed on May 15, 2008, in light of the policy now in place. (Complaint). Plaintiffs continue to claim that the HPD grooming policy constitutes racial discrimination, in violation of 42 U.S.C. § 1981, and disability discrimination in violation of 29 U.S.C.A. § 504, the Rehabilitation Act of 1973. The current complaint also alludes to claims for retaliation, but no specific legal or factual bases for those claims have been provided.[1] Further, Plaintiffs now include Chief Hurtt as a Defendant, alleging that he is also liable to each of them for the unlawful discrimination. (*Id.*). On December 15,

---

[1] Plaintiffs also state that the court "has supplemental jurisdiction over state law claims discussed below." (Complaint ¶ 5). But Plaintiffs have not identified or raised any state law claims. Similarly, the court notes that, in their response to Defendants' Motion for Summary Judgment, Plaintiffs allude to the fact that § 1983 can be used to bring claims under the 14th amendment, but again, Plaintiffs do not raise a 14th amendment claim in the present complaint, and neither party has addressed such a claim. In any event, a "claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *See Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir.2005).

2008, and on January 9, 2009, officers Wisley Epps and Charles Mickens, joined the action as intervenors. (Docket Entry #22; Docket Entry #32).

Defendants have moved for summary judgment on all of Plaintiffs' claims, arguing that the challenged grooming policy is a legitimate business necessity; that Plaintiffs are not disabled under the Rehabilitation Act; and that Plaintiffs have abandoned any claims under Title VII. (Defendants' Motion). Finally, Defendants argue that, even if violations could be shown, Chief Hurtt is entitled to qualified immunity. (*Id.*). After a review of the motion, the evidence provided, and the applicable law, it is **RECOMMENDED** that Defendants' motion be **GRANTED**.

**STANDARD OF REVIEW**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323; *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the non-movant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. *Id.* When the moving party has met its Rule 56 burden, the non-movant cannot survive a motion for summary judgment by resting merely on the allegations of its pleadings. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). If the movant does meet his burden, the non-movant must go beyond the pleadings and designate specific facts to show that there is a genuine issue for trial. *Little,* 37

F.3d at 1075. Further, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

To meet its burden the nonmoving party must present "significant probative" evidence indicating that there are issues of fact remaining for trial. *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994). If the evidence presented to rebut the summary judgment motion is only colorable or not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986). But, in deciding a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 248. However, "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Little*, 37 F.3d at 1075. Conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996).

**DISCUSSION**

***Section 1981***

Plaintiffs claim, first, that the grooming policy is racially discriminatory, in violation of 42 U.S.C. § 1981. While it is not entirely clear on what basis Plaintiffs rely on § 1981 for relief, they do allege that the grooming policy "constitutes intentional discrimination, in and of itself." (Plaintiffs' Response p.5). In response to all of the allegations, Defendants contend that the

"evidence conclusively demonstrates that Defendants did not intentionally discriminate against Plaintiffs"; that "Plaintiffs fail to identify . . . evidence demonstrating that similarly situated employees" were treated differently; that Defendants have "established a legitimate, non-discriminatory rationale for their policy"; and that Plaintiffs cannot show "that Defendants' stated rationale of promoting safety was merely a pretextual cover for racial discrimination." (Defendants' Motion p.9; Defendants' Reply pp.2-3).

> Section 1981 guarantees that,

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens,

42 U.S.C. § 1981(a). A racial discrimination claim under § 1981 can be established through either direct or circumstantial evidence.[2] *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir.2003). If a plaintiff can show direct evidence of racial discrimination, the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor. *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 192 (5th Cir.2001). But if, as here, a plaintiff relies only on circumstantial evidence, the claim is examined under the well-known *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that rubric, the plaintiff must first make a prima facie showing of discrimination. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir.2007). "A prima facie case may be established by a showing that the plaintiff was a member of an identifiable [protected class]; that he was qualified for the benefit or promotion he sought; that he was denied these benefits and such denial constitutes an adverse employment

---

[2] Section 1981 claims are governed by the same evidentiary framework as Title VII claims, and a court employs the same analysis in evaluating both.  *Roberson v. Alltel Information Services*, 373 F.3d 647, 651 (5th Cir. 2004); *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000); *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1284 n.7 (5th Cir. 1994).

decision; and that the adverse employment decision was differentially applied to plaintiff." *Rubinstein v. Administrators of Tulane Educational Fund*, 218 F.3d 392, 399 (5th Cir. 2000). A failure of proof on any element of the prima facie case "requires summary judgment against the entirety of the claim." *Munoz v. Orr*, 200 F.3d 291, 307 (5th Cir. 2000).  On the other hand, if a claimant can establish a prima facie case, then "an inference of unlawful discrimination" has been raised. *Blow v. City of San Antonio*, 236 F.3d 293, 296-97 (5th Cir. 2001). The "employer must [then] rebut a presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment action." *Turner*, 476 F.3d at 345 (5th Cir.2007). If the employer meets its burden, the burden "shifts back to the plaintiff to present substantial evidence that the employer's reason was pretext for discrimination." *Id*. If the plaintiff can show pretext, that showing, coupled with the prima facie case, will usually be sufficient to survive summary judgment. *Id*.

It is fundamental, however, as Defendants point out, that a plaintiff with a claim under § 1981 must show that he was the subject of intentional discrimination. *See Coleman v. Houston Independent School Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). "[A] cause of action for racial discrimination in the making and enforcement of contracts, under § 1981, requires the plaintiff to demonstrate intentional discrimination." *Id*. A complaint that a given policy has a disproportionate impact on a protected class is not actionable under that statute. *See National Ass'n of Government Employees v. City Public Service Bd.*, 40 F.3d 698, 715 (5th Cir. 1994)(citing *Washington v. Davis*, 426 U.S. 229, 238-240 (1976)). "Plaintiffs are required . . . under section 1981, to demonstrate intentional discrimination; mere disparate impact will not suffice." *Id*. At the outset, then, it is critical to note that, although Plaintiffs claim that the grooming policy "constitutes intentional discrimination, in and of itself," the officers have

presented no evidence that they have been subjected to intentional discrimination. (Plaintiffs' Response p.5). Plaintiffs do not dispute that the policy is facially neutral, and they have presented no evidence to show that the complained of policy has been applied differently to them on the basis of race. While Plaintiffs do contend that "Defendants did not similarly penalize those officers" who have "other conditions that equally affect the use of the Scott Promask 40," they have not identified or offered proof of any such officers who were reportedly not "penalized." (Plaintiffs' Response p. 10). Further, in each of their depositions, Plaintiffs concede that they have no evidence that Defendants intended to discriminate against them by implementing the grooming policy at issue. For example, when asked why he thought HPD had instituted the grooming policy, Officer White stated that it was "probably more [of] a liability thing . . . That's my guess." (White Deposition 55:9-11). Likewise, when asked whether he had any evidence to show that "Chief Hurtt intended to discriminate against black men when he issued the policy," Officer Perkins answered, "Other than the policy itself, no. And I can't say what his intentions were." (Ex. G to Defendants' Motion: Deposition of Kenneth Perkins 72:14-15; *see also* Ex. F to Defendants' Motion: Deposition of Shelby Stewart 46:2-4 ("I can't speak to Chief Hurtt's motivations or what his intentions were"); Collins Deposition 72:1 (I don't have [evidence] at this time"); Epps Deposition 36:12-13 ("I can't tell you what his intent was, no"); Ex. K to Defendants' Motion: Deposition of Charles Mickens 36:1 ("I personally don't have any knowledge [of Chief Hurtt's intentions]")).

Instead of showing racially disparate treatment, Plaintiffs underscore that the "official policy[] is discriminatory in nature, and has a disparate impact on them." (Complaint ¶ 14). But, again, only intentional discrimination is actionable under § 1981; "mere disparate impact will not suffice." *See City Public*, 40 F.3d at 715. Because Plaintiffs challenge only the effect of the

grooming policy, and have not shown that they were subjected to intentional discrimination, they have failed to state an actionable claim under         § 1981. Defendants' motion for summary judgment on that issue should be granted.

***Rehabilitation Act***

In the current complaint, Plaintiffs also allege that PFB is a qualified disability under 29 U.S.C.A. § 794, the Rehabilitation Act of 1973, and that Defendants have failed to accommodate this condition. To establish a prima facie case of discrimination, under the Rehabilitation Act, a plaintiff must prove that (1) he is an "individual with a disability;" (2) who is "otherwise qualified" for the position sought; (3) who worked for a "program or activity receiving Federal financial assistance;" and (4) that he was discriminated against "solely by reason of her or his disability." *Hileman v. City of Dallas, Tex.*, 115 F.3d 352, 353 (5th Cir.1997) (quoting 29 U.S.C. § 794(a)). To determine whether there has been a violation, the Rehabilitation Act adopts the standards applied to 42 U.S.C. § 12111, et seq., Title I of the Americans with Disabilities Act of 1990 ("ADA"). 29 U.S.C. § 794(d). A "disability" includes (1) a mental or physical impairment that substantially limits one or more major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001) (citing 42 U.S.C. § 12102(2)). To determine whether an employee has a "mental or physical impairment that substantially limits one or more major life activities" within the meaning of the ADA, courts must determine: (1) whether the employee has an impairment; (2) whether the activity on which the employee relies is a major life activity; and, if so, (3) whether the employee's impairment substantially limits that major life activity. *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 654 (5th Cir.2003). "Substantially limits" has been held to mean that one is "[s]ignificantly restricted as to the condition, manner or duration under which an

individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 469 (5th Cir.2009) (citing 29 C.F.R. § 1630.2(j)(1)).[3] Major life activities may include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3. Here, Plaintiffs argue that their PFB substantially limits their ability to work. (Plaintiffs' Response p. 14-15). In this context,

> substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727 (5th Cir. 1995) (citing 29 C.F.R. § 1630.2(j)(3)(i)). "To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999). Indeed, "the impairment must substantially limit employment generally." *Id.* at 354.

Before this court, Plaintiffs present no evidence to support their Rehabilitation Act claims. In their response to Defendants' motion for summary judgment, Plaintiffs do not argue that PFB limits their ability to work generally. In fact they "concede the fact that they are still employed as police officers with the City of Houston Police Department." (Plaintiffs' Response p.15). Plaintiffs claim only that their PFB "substantially limits their ability to engage in the major life activity of working in all departments as a result of the City of Houston's no-beard policy."

---

[3] Congress recently enacted the ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (2008), to broaden the interpretation of "substantially limits." But these changes are not to be applied retroactively. *See EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 469 n. 8 (5th Cir.2009) (citing *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 (1994)).

(*Id*.). But the ability to work in any one particular department within the City of Houston is not a major life activity. *See Dutcher*, 53 F.3d at 727. Plaintiffs also complain that they are "unable to work extra jobs which are customary for all law enforcement officers." (Complaint ¶13). But the "inability to work overtime is not a substantial limitation on the ability to work." *Miller v. Southwestern Bell Telephone Co.*, 51 Fed.Appx. 928, 2002 WL 31415083, at *5 (5th Cir. 2002) (unpublished) (citing with approval *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 598-99 (6th Cir. 2002). An "impairment must substantially limit employment generally." *Sutton*, 527 U.S. at 354. Plaintiffs have not offered evidence to make such a showing. On this record, then, Plaintiffs have not shown that they  suffer from a disability that the City was obligated to accommodate under the terms of the Rehabilitation Act. Defendants' motion for summary judgment on that claim should be granted as well. *See Sutton*, 527 U.S. at 492; *Newberry v. East Texas State University*, 161 F.3d 276, 280 (5th Cir. 1998).

### *Abandoned claims*

Finally, Defendants argue that Plaintiffs have waived or abandoned their retaliation claims, and any claims under 42 U.S.C. § 2000e, Title VII of the Civil Rights Act of 1964. It is true that although each Plaintiff complained of retaliation, none of them responded to Defendants' motion for summary judgment on that allegation. (Complaint ¶¶ 36-37; Epps' Complaint ¶¶ 36-37; Mickens' Complaint ¶¶ 33-34; *see generally* Plaintiffs' Response). The Fifth Circuit has held repeatedly that if a party fails to pursue a claim or defense beyond the initial pleading, the issue is deemed abandoned. *See Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n. 1 (5th Cir.2006) (plaintiff abandoned retaliation claim when she failed to defend claim in response to motion to dismiss); *Vela v. City of Houston*, 276 F.3d 659, 678-79 (5th Cir.2001) (limitations defense not raised in response to motion for summary judgment or supplemental

answer was abandoned). Because Plaintiffs did not contest Defendants' motion for summary judgment on their retaliation claims, the claims are deemed abandoned, and summary judgment is appropriate on that issue. *Black*, 461 F.3d 588 n. 1.

Defendants also argue that Plaintiffs waived any claims they may have had under 42 U.S.C. § 2000e, Title VII of the Civil Rights Act of 1964, by failing to include those claims in their Second Amended Complaint. In their Original Complaint, Officers Stewart, Perkins, Collins, and White made the following allegations:

> Defendant, City of Houston Police Department, discriminated against Plaintiffs in connection with the compensation, terms, conditions and privileges of employment or limited, segregated or classified Plaintiffs in a manner that would deprive or tend to deprive them of any employment opportunity or adversely affect their status because of Plaintiffs' race and color in violation of 42 U.S.C. Section 2000e (2)(a).

> Defendant, City of Houston Police Department, classified Plaintiffs in a manner that deprived them of an equal employment opportunity that was provided to other non-black employees similarly situated in violation of 42 U.S.C. Section 2000e (2)(a).

(Original Complaint ¶¶ 10-11). Almost identical claims were repeated in the First Amended Complaint. (First Amended Complaint ¶¶ 17-18). But in the Second Amended Complaint, the pleading at issue, Plaintiffs allege only that "[t]his action arises under 42 U.S.C. § 1983 (1996), 42 U.S.C. § 1981 as amended by the Civil Rights Act of 1991, and the Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794." [4] (Complaint ¶4). Plaintiffs made no reference to their previous complaints or to the Title VII claims originally raised in them. Further, neither Epps' nor Mickens' complaints in intervention raised claims under Title VII, and this was noted in the order allowing them to intervene. (Memorandum and Recommendation on Motion to Intervene

---

[4] Plaintiffs repeatedly argue that "Defendants are liable to Plaintiffs for violating Plaintiffs rights under . . . 42 U.S.C. § 1983." (Plaintiffs' Response p. 8). But § 1983 simply "creates a private right of action for redressing the violation of federal law by those acting under color of state law . . . It is not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere." *Colson v. Grohman*, 174 F.3d 498, 504 n. 2 (5th Cir.1999) (*citing Migra v. Warren City School District Board of Education*, 465 U.S. 75 (1984), and *Albright v. Oliver*, 510 U.S. 266 (1994)).

by Wisley Epps p. 4; Mickens' Complaint). Now, however, in response to Defendants' motion for summary judgment, Plaintiffs argue that they maintained claims under Title VII in their Second Amended Complaint by alluding to the exhaustion of administrative remedies as a condition precedent to bringing this action. (Plaintiffs' Response p. 7-8). In the alternative, Plaintiffs seek leave to amend their complaint to include claims under Title VII. (*Id.*).

"An amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994). After raising Title VII claims in their Original Complaint and in their First Amended Complaint, Plaintiffs deleted those allegations in the current pleading.  In that filing, Plaintiffs did not refer to or incorporate the previous complaints. (Complaint). Even construing the current complaint liberally, Plaintiffs' reference to administrative exhaustion does not show reliance on Title VII, because exhaustion is a condition precedent to their Rehabilitation Act claims as well. *See* 29 U.S.C. § 794; *Prewitt v. United States Postal Serv.*, 662 F.2d 292, 303-04 (5th Cir.1981). Further, since filing the Second Amended Complaint,  Plaintiffs have repeatedly failed to assert any Title VII allegations. Neither Intervenor raised the claims, or objected to the court's acknowledgment that they had not done so. Likewise, in Plaintiffs' motion to extend the discovery deadlines, they stated that this action was brought only "to remedy violations of civil rights under 42 U.S.C. § 1983 (1996), and 42 U.S.C. § 1981 as amended by the Civil Rights Act of 1991." (Plaintiffs' Motion To Enlarge Time For Discovery And Dispositive Motions, Docket Entry #35). On this record, the court agrees with Defendants that Plaintiffs have abandoned any claims they may have had under Title VII. *See King*, 31 F.3d at 346.

The question now becomes whether Plaintiffs should be allowed to amend their pleadings to add Title VII claims at this late date. Under Federal Rule of Civil Procedure 15(a), pleadings may be amended once as a matter of course before a responsive pleading is served, and thereafter by leave of court. *See* Fed.R.Civ.P. 15(a). The rule also provides, however, that such leave "shall be freely given when justice so requires," but "it is by no means automatic." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993)(quoting *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981). In determining whether to grant leave to amend, trial courts consider the following factors: whether there has been (1) undue delay, (2) bad faith or dilatory motive on the part of the movant, (3) a repeated failure to cure deficiencies by amendments previously allowed, (4) undue prejudice to the opposing party, and (5) whether the amendment would be futile. *See id*. Leave to amend is entrusted to the sound discretion of the trial court, and such a decision is reversible only for an abuse of discretion. *Addington*, 650 F.2d at 666. However, "if the district court lacks a 'substantial reason' to deny leave, its discretion 'is not broad enough to permit denial.'" *Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir.1985).

Here, Plaintiffs have offered no explanation for their delay in asking to amend their complaint for the third time, and the request was made only three months from the anticipated trial date. Plaintiffs were obviously aware of the potential claims, and the underlying facts, when they included the claims in their Original Complaint on November 27, 2007. (Plaintiffs' Original Complaint). Amended pleadings were due on May 30, 2008, and the deadline for both discovery and dispositive motions passed on May 12, 2009. (Scheduling and Docket Control Order, Docket Entry # 16; Order Granting Plaintiffs' Agreed Motion to Enlarge Time for Discovery and Dispositive Motions, Docket Entry #36). The parties' joint pretrial order is due on August 21,

2009. Amending the complaint to include Title VII claims at this late stage would almost certainly delay the trial, and prejudice Defendants in the preparation of their case.

More importantly, on this record, it would be futile for Plaintiffs to add Title VII claims. Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). Plaintiffs claim that the grooming policy has a disparate impact on African-American officers, in violation of Title VII. To establish a prima facie case of discrimination, based on disparate impact, a plaintiff must show: (1) an identifiable, facially neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two. [5] *McClain v. Lufkin Industries, Inc.*, 519 F.3d 264, 275, 276 (5th Cir. 2008). The burden of proof then shifts to the defendant to show that the challenged policy is a business necessity. *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006). However, the plaintiff can still prevail if he shows that an equally effective, less discriminatory alternative exists, or that the defendant's proffered business necessity is merely a pretext for discrimination. *Int'l Bhd. of Elec. Workers v. Miss. Power & Light Co.*, 442 F.3d 313, 316-318 (5th Cir.2006).

Defendants contend that, even if Plaintiffs could meet their prima facie burden, the grooming policy is necessary to promote the safety of "uniformed police officers such as Plaintiffs," because the required respirators cannot be used effectively by persons with facial hair. (Defendants' Motion p. 14). Protecting employees from workplace hazards can, as a matter of law, qualify as legitimate business necessity, and a defense to Title VII liability. *See Levin v. Delta Air Lines, Inc.*, 730 F.2d 994, 997 (5th Cir. 1984); *Fitzpatrick v. City of Atlanta*, 2 F.3d

---

[5] Claims under Title VII and under §1981 are governed by the same evidentiary framework and the same legal analysis.  *Roberson v. Alltel Information Services*, 373 F.3d 647, 651 (5th Cir. 2004); *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000); *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1284 n.7 (5th Cir. 1994).

1112, 1119 (11th Cir. 1993) (fire department's no beard policy justified as a business necessity due to safety concerns with the use of respirators). Defendants cannot rest on that contention, however, and must show that the grooming policy is, in fact, required to protect employees from documented hazards. *See Levin v. Delta Air Lines, Inc.*, 730 F.2d 994, 997 (5th Cir. 1984); *Fitzpatrick*, 2 F.3d at 1119. To make this showing, Defendants rely on expert testimony, and they point to national occupational safety standards. The record is undisputed that, in the event of a CBRN attack, HPD officers serving as first responders are expected to set up perimeters, and to assist with the evacuation of the wounded, all "while remaining outside of any contaminated zones." (Hurtt Affidavit ¶5). Officers that are caught inside a contaminated zone are required to don respirators and retreat from the area. (*Id*.). Defendants' expert witness, Robert Brennan, testified that the Scott Promask 40 is widely used, and is "one of the most suitable respirators available . . . for first responders." (Brennan Affidavit ¶5). The record is also clear, however, that the Scott Promask 40 cannot be used safely by persons with facial hair, because facial hair prevents a proper seal between the respirator and the skin. (*Id*.). This conclusion is further supported by the manufacturer's warnings, and the findings by OSHA,[6] the National Institute for Occupational Safety and Health, and the American National Standards Institute. (Brennan Report). Given these undisputed facts, Defendants instituted a grooming policy that prohibits bearded officers in the four HPD divisions that are most likely to serve as first responders. (Hurtt Affidavit ¶14).

While the Fifth Circuit has yet to address a case directly on point with these facts, the Eleventh Circuit's holding in *Fitzpatrick v. City of Atlanta*, on which both parties rely, is

---

[6] Plaintiffs note, and Defendants concede, that HPD, as a public employer, is "not bound by OSHA standards." (Plaintiffs' Response p.13; Defendants' Reply p.7). But "such standards certainly provide a trustworthy bench mark for assessing safety-based business necessity claims." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1121 (11th Cir. 1993).

informative. 2 F.3d 1112 (11th Cir. 1993). In *Fitzpatrick*, Atlanta firefighters challenged the city's no-beard policy, claiming disparate impact under Title VII. *Id*. The City of Atlanta claimed that beards interfered with the safe and effective use of its selected respirators. *Id*. at 1120. The Eleventh Circuit  recognized that "protecting employees from workplace hazards is a goal that, as a matter of law, has been found to qualify as an important business goal." *Id*. at 1119 (citing *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587 & n. 31 (1979)). But it also stressed that "merely asserting a safety rationale does not suffice to prove the defense," and that, "to establish a safety-based business necessity defense, employers have been required to present convincing expert testimony demonstrating that a challenged practice is in fact required to protect employees or third parties from documented hazards." *Id*. at 1119 n.6 (citing *Levin v. Delta Air Lines, Inc.*, 730 F.2d 994, 997 (5th Cir. 1984)).  To meet its burden, the city relied on an affidavit from an expert in occupational safety and health, who testified that "facial hair is likely to interfere with the forming of a proper seal between the [respirator] and the wearer's face." *Id*. at 1119-1120. The city also relied on warnings from OSHA, NIOSH, and ANSI, which all recommended that a respirator "should not be worn with facial hair which contacts the sealing surface of the face piece." *Id*. at 1120. Based on this evidence, the court found that the defendant had met its "summary judgment burden on the business necessity issue." *Id*. at 1120. The court was "swayed particularly" by the recommendations of OSHA, NIOSH, ANSI. *Id*. at 1121. Because the firefighters did not present a genuine issue of material fact on whether the city's safety justification was a mere pretext for racial discrimination, or whether less discriminatory alternatives existed, the Eleventh Circuit affirmed summary judgment in favor of the city. *Id*. at 1122-1123.

Just as in *Fitzpatrick*, Defendants here have presented expert testimony to show that the Scott Promask 40 cannot be used effectively by bearded officers. Defendants have also pointed to similar findings by OSHA, NIOSH, and ANSI. On this undisputed record, then, Defendants have shown that the challenged grooming policy is a legitimate, necessary policy designed to protect those officers in the four divisions most likely to serve as first responders. *Pacheco v. Mineta*, 448 F.3d 787; *Levin*, 730 F.2d at 997; *Fitzpatrick*, 2 F.3d 1119.

Under the prevailing law, the burden now shifts to Plaintiffs to raise a genuine issue of material fact on whether this proffered justification for the current policy is a mere pretext for discrimination, or whether less discriminatory alternatives exist. But seventeen months after Plaintiffs first asserted Title VII claims in their Original Complaint, and after the time for discovery has closed, Plaintiffs offer only conclusory allegations and unsubstantiated assertions. *See Douglass*, 79 F.3d at 1429 (conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment).  Plaintiffs argue that HPD's current policy is a pretext for discrimination for two reasons. First, Plaintiffs claim that the deposition testimony from Brennan and Hurtt is proof that the Scott Promask 40 "cannot be used for the purposes given." (Plaintiffs' Response p. 12). To support this assertion, Plaintiffs cite an excerpt from Brennan's deposition in which he states that "[s]ome air will penetrate the seal" of the chosen mask. ((Ex. E to Defendants' Motion: Deposition of Robert Brennan ["Brennan Deposition"] 75:12-20). That excerpt is unpersuasive on Plaintiffs' point, however, because Brennan clearly explains that "[t]here is no such thing as a perfect seal on a faceplate," and that the "question is how much of a seal" there is in a given protective device. (*Id.*). Similarly, Plaintiffs cite excerpts from the expert witnesses' depositions in which each one acknowledges that the Scott Promask 40 is not designed to work in contaminated areas. But, in

both his deposition and in his affidavit, Hurtt is explicit that the officers serving as first responders are not expected to work in contaminated areas, but are required to "put on the appropriate personal protective gear and back out of the area." (Hurtt Deposition 18:14-19:4). For that purpose, Brennan concluded that the Scott Promask 40 is "one of the most suitable respirators available . . . for first responders." (Brennan Affidavit ¶5).

Secondly, Plaintiffs claim that "the City's safety concerns are minimal at best as indicated by its testing concerning the gas masks." (Plaintiffs' Response p.7). The record shows that, following selection of the Scott Promask 40, HPD's uniformed officers were individually tested to ensure that the seal on the mask was proper. (King Deposition 183:13-25). Brennan's testimony is clear that such tests can be based on either qualitative or quantitative criteria. (Brennan Deposition 80:12-14, 108:22-25). In qualitative tests, such as those that HPD performed, the test subject is asked whether  he or she can detect a selected airborne agent that the mask should filter out. (Brennan Affidavit ¶6). Quantitative tests, on the other hand,  involve "a measurement of how much bad air is leaking into the facepiece." (Brennan Deposition 78:13-14). Plaintiffs argue that "[a]ccording to Robert Brennan, the Defendants' expert witness, the testing given by Defendants was totally ineffective in determining the effectiveness of the Scott Promask 40 gas mask." (Plaintiffs' Response p.7). As a threshold matter, it is not clear what point Plaintiffs are urging by emphasizing this testimony and pursuing this line of argument. Defendants maintain that the HPD grooming policy was revised to prohibit beards because "respirator safety professionals and occupational health and safety regulations . . . were . . . unanimous in holding that facial hair precluded a respirator user's ability to obtain a good seal." (Hurtt Affidavit ¶ 9). The record is clear that the qualitative testing that Plaintiffs now challenge was conducted only to ensure a proper seal for each individual officer who was issued a Scott

Promask 40 respirator, not to determine whether the mask could be worn effectively by bearded officers in general. (King Deposition 183:13-25). In any event, Plaintiffs present no evidence to show that qualitative testing is considered "totally ineffective." It is true that Brennan testified that he is "biased as a researcher towards testing that gives you numbers." (Brennan Deposition 80:12-14, 108:22-25). But he also clearly stated that "both [qualitative and quantitative] tests have their place," and that qualitative testing is accepted and authorized under OSHA standards. (*Id.*; Brennan Affidavit ¶6). On this record, Plaintiffs' proffered evidence regarding the testing of individual officers, after the masks were selected, does not raise the specter of discriminatory pretext.

Finally, Plaintiffs identify two purported alternatives to the grooming policy to show that Defendants' safety concerns can be addressed without requiring clean shaven officers in the four designated divisions. (Plaintiffs' Response p. 14). Those alternatives include the use of escape-hood respirators, and a "redeployment" policy in the event of a CBRN attack. (*Id.*). But, again, Plaintiffs provide no evidence to show that these are "equally effective alternative[s]" to HPD's needs. *See Int'l Bhd. of Elec. Workers*, 442 F.3d at 316-318. For example, Plaintiffs claim that, by wearing escape-hood respirators instead of tight fitting face masks such as the Scott Promask 40, bearded officers could serve in the four designated divisions that currently prohibit beards. But Defendants chose the Scott Promask 40 because it is "easy to use; versatile; cost effective; and compatible with the use of other police equipment," and because it would not "impair mobility or prevent the public from identifying a uniformed police officer as such." (Hurtt Affidavit ¶8). Plaintiffs have not shown, or even argued, that escape-hood respirators also meet these criteria. Nor do Plaintiffs dispute Brennan's conclusion that the "escape hood gas mask is bulkier and more difficult to don . . . [and] can interfere with the use of other equipment . . .

[and] provide[s] a more limited duration of protection than the Promask 40 which makes the escape hood inappropriate for use by first responders." (Brennan Affidavit ¶4).

Similarly, Plaintiffs claim that bearded officers could be "redeployed" in the event of a CBRN attack. But Plaintiffs do not attempt to show how a "redeployment" policy meets, or even addresses, Defendants' goal of allowing uniformed officers to safely *escape* from the scene of a CBRN attack. On this record, then, it would be futile for Plaintiffs to amend their complaint to add claims under Title VII. For that reason, and in light of the unexplained delay in seeking leave to amend, when added to the disruption and prejudice such an amendment would create, Plaintiffs should not be granted leave to amend their complaint at this late stage.

Based on the facts before the court, Plaintiffs have shown no violation of their state, federal, or constitutional rights. Because Plaintiffs have not made such a showing, the court need not consider whether Chief Hurtt is entitled to the defense of qualified immunity.

**CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED**. Plaintiffs have waived or abandoned their claims for retaliation, and their claims under Title VII. Further, there is no question of fact on Plaintiffs' remaining claims under 42 U.S.C. § 1981, and 29 U.S.C. § 794, the Rehabilitation Act of 1973. For these reasons, summary judgment should be granted in favor of Defendants on all of Plaintiffs' claims.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal

conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

SIGNED at Houston, Texas, this 7th day of August, 2009.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**